UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-------------------------------------------------------------------X

AMADOU BARRY, Individually and on Behalf of
All Other Persons Similarly Situated,

                Plaintiffs,

**MEMORANDUM AND
ORDER**

11–CV–5089 (SLT) (JMA)

    -against-

S.E.B. SERVICE OF NEW YORK, INC., and
ROBERT DINOZZI,

                Defendants.

-------------------------------------------------------------------X

APPEARANCES:

Lloyd R. Ambinder
Suzanne B. Leeds
Virginia & Ambinder LLP
111 Broadway
14th Floor, Suite 1403
New York, NY 10006

Jeffrey K. Brown
Jessica L. Parada
Leeds Brown Law, P.C.
One Old Country Road
Suite 347
Carle Place, NY 11514
    *Attorneys for Plaintiffs and Putative Class*

Richard J. Rabin
Anastasia Kerdock
Akin Gump Strauss Hauer & Feld, LLP
One Bryant Park
New York, NY 10036
    *Attorneys for Defendants*

**AZRACK**, **United States Magistrate Judge:**

Plaintiffs Amadou Barry and Gungor Akcelik (collectively, "plaintiffs"), the named plaintiffs in this putative collective and class action,[1] worked as security guards at defendant S.E.B. Service of New York, a company owned by individual defendant Robert DiNozzi (collectively, "SEB" or "defendants").  Plaintiffs allege that SEB violated the Fair Labor Standard Act ("FLSA"), 29 U.S.C. § 201 et seq., the New York Labor Law ("NYLL") §§ 652, 663, § 190 et seq., and New Jersey law by failing to pay overtime and other required compensation to similarly situated undercover and uniformed guards.  Currently pending before the Court is plaintiffs' motion for conditional certification of their FLSA claims for nationwide classes of uniformed and undercover guards.  The Honorable Sandra L. Townes referred his motion to me for decision.  For the reasons stated below, the Court grants plaintiffs' motion and authorizes notice to all uniformed and undercover guards who worked for SEB since May 7, 2009.

## BACKGROUND

The instant record consists of:  (1) declarations from Barry, Akcelik, former named plaintiff Engin Malcok, and five other guards who opted in to this suit; (2) the deposition testimony of Barry, Akcelik, Malcok, and Frank Newton, defendants' Rule 30(b)(6) witness; (3) payroll records of the named and opt-in plaintiffs submitted by both plaintiffs and defendants; and (4) declarations of various guards and Newton submitted by defendants.

SEB is a security services company that employs uniformed and undercover security guards.  Decl. of Frank Newton ("Newton Decl.") ¶¶ 3, 4, ECF No. 41.  SEB operates in 22

---

[1]  As discussed infra, defendants have consented to the filing of an amended complaint that adds Akcelik as a named plaintiff.  On November 15, 2012, defendants provided the Court with a copy of plaintiffs' proposed amended complaint as an exhibit to a separate submission.  ECF No. 65.  Plaintiffs, however, have never formally filed the amended complaint on the docket.  Plaintiffs are hereby directed to do so by December 11, 2013.

states and employs approximately 2,000 guards.  Newton Decl. ¶ 3; Dep. of Franklin Newton ("Newton Dep.") 68:14–15, Suppl. Reply Decl. of Suzanne Leeds, ECF No 68.  SEB's guards are posted at over 150 locations, Newtown Decl. ¶ 3, including Walgreens pharmacies, King Kullen supermarkets, movie theatres, and hotels, Newton Dep. 67.  Although the record does not indicate the precise number of undercover security guards, only a small portion of SEB's guards work undercover.  Newton Dep. 73:2–9; 165:2–5; see also id. at 272:21–273:20.

To record their time, guards would sign in and out on timesheets at each location.[2]  See, e.g., Decl. of Amadou Barry ("Barry Decl.") ¶ 7, ECF No. 39.  The time sheets were then sent to the payroll department at SEB's New York office, where all payroll functions are performed.  Newton Dep. 32:3–15, 36:7–9.

Although SEB paid guards overtime on some occasions, plaintiffs allege that SEB engaged in various practices that resulted in SEB not paying overtime for all hours worked and not paying overtime at the correct rate.

## PROCEDURAL HISTORY

On October 19, 2011, plaintiffs Engin Malcok and Barry, who both worked as undercover guards, filed the instant complaint.  Compl., ECF No. 1.

On May 7, 2012, plaintiffs served defendants with their motion for conditional certification under the FLSA.  Not. Mot. Conditional Certif., ECF No. 38.  The parties filed the fully briefed motion with the Court on July 20, 2012.  ECF Nos. 38–45.  In their opposition brief, defendants argued, inter alia, that the Court should deny conditional certification as to the uniformed guards because none of the named or opt-in plaintiffs who worked as uniformed guards had timely FLSA claims.  Plaintiffs responded by submitting, along with their reply brief,

---

[2]  Neither party addresses the extent to which SEB has preserved the guards' time sheets.

a declaration from Akcelik, a uniformed guard.  ECF No. 44.  On July 26, 2012, plaintiffs also filed a pre-motion conference letter seeking to amend the complaint to add Akcelik as a named plaintiff in place of Malcok, whose FLSA claims were time-barred.  ECF No. 46.

On August 27, 2012, Judge Townes referred three matters to me:  (1) plaintiffs' motion for conditional certification; (2) plaintiffs' proposed motion to amend the complaint; and (3) a motion to dismiss that DiNozzi filed early in the litigation.  Aug. 28, 2013 Order, ECF No. 50.  On October 1, 2012, I held a pre-motion conference to address the pending motions.  ECF No. 55.  Defendants agreed not to oppose the motion to amend, and the Court allowed defendants to depose Akcelik and file a response addressing his testimony.  Id.  DiNozzi decided not to pursue his motion to dismiss after reviewing plaintiffs' proposed amended complaint.  ECF No. 60.  The parties also agreed to dismiss Malcok from this action.  ECF Nos. 56–57.  On November 15, 2012, defendants filed a supplemental reply addressing Akcelik's testimony.  Defs.' Suppl. Reply Mem. Opp'n Mot for Conditional Certif. ("Def. Suppl. Mem."), ECF No. 63.  On November 16, 2012, plaintiffs requested permission to file a response to defendants' filing.  Pls.' Nov. 16, 2013 Ltr., ECF No. 65.  On April 8, 2013, I granted plaintiffs' request.  On April 24, 2013, plaintiffs filed their response, which includes the deposition testimony of SEB's Rule 30(b)(6) witness, Frank Newton, whose deposition occurred after plaintiffs filed their reply brief.  ECF Nos. 67–68.

Currently before the Court is plaintiffs' motion for conditional certification.

## DISCUSSION

### A.      Standard for Conditional Certification under the FLSA

Under Section 216(b) of the FLSA, a collective action may be maintained by named plaintiffs "for and in behalf of . . . themselves and other employees similarly situated."

4

29 U.S.C. § 216(b) (emphasis added).  Unlike opt-out class actions under Federal Rule of Civil

Procedure 23, an employee must affirmatively opt in to a collective action.  See id.

By allowing employees to proceed collectively, collective actions provide plaintiffs "the

advantage of lower individual costs to vindicate rights by the pooling of resources" and allow

"efficient resolution in one proceeding of common issues of law and fact arising from the same

alleged [unlawful] activity."  Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989).

FLSA collective actions often proceed in two stages.  Myers v. Hertz Corp., 624 F.3d

537, 554–55 (2d Cir. 2010), cert. denied, 132 S.Ct. 368 (2011).  At the first stage (also known as

the conditional certification stage), the court determines, early in the litigation and based on a

lenient standard of proof, whether to send notice to potential opt-in plaintiffs to inform them that

they may join a collective action.  Id. at 555.  Courts often refer to the decision to facilitate this

notice as "conditional certification."  See, e.g., Jenkins v. TJX Companies Inc., 853 F. Supp. 2d

317, 320 (E.D.N.Y. 2012); cf. Myers, 624 F.3d at 555 at n.10.  The second stage (also known as

the decertification stage) occurs after the completion of class discovery, when the court

determines, under a stricter analysis, whether the opt-ins and named plaintiffs are, in fact, all

similarly situated and can proceed to trial as a collective action.  Id.

District courts have discretion, in "appropriate cases," to facilitate notice at the

conditional certification stage.  Hoffmann-La Roche, 493 U.S. at 170.  In Myers, the Second

Circuit offered some guidance, in dicta, on the analysis applicable at this stage.  Myers, 624 F.3d

at 555.  "[T]he court mak[es] an initial determination to send notice to potential opt-in plaintiffs

who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation

has occurred."  Id.  Plaintiffs can establish that potential opt-ins are similarly situated by making

"a 'modest factual showing' that [the named plaintiffs] and potential opt-in plaintiffs 'together

were victims of a common policy or plan that violated the law.'" Id. (quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).  "The modest factual showing cannot be satisfied simply by unsupported assertions, but it should remain a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist."  Id. (citations and internal quotation marks omitted); see also Hanchard-James v. Brookdale Family Care Ctrs., No. 12–CV–1922, 2012 WL 3288810, at *2 (E.D.N.Y. Aug. 9, 2012) ("The Second Circuit and numerous district courts within it have acknowledged that the plaintiff's burden at this initial stage is quite lenient.").

At the conditional certification stage, "the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." Amador v. Morgan Stanley & Co. LLC, No. 11–CV–4326, 2013 WL 494020, at *3 (S.D.N.Y. Feb. 7, 2013).

**B.     Parties' Arguments**

Plaintiffs argue that SEB's policy of not paying guards for time they spend traveling between worksites results in unpaid overtime and warrants conditional certification.  Plaintiffs also contend that, although SEB paid some overtime, SEB has a general practice of not paying overtime for all hours worked, which is evidenced primarily by:  (1) SEB's failure to pay overtime at the proper rate; and (2) instances where guards' hours were "shorted."  Additionally, plaintiffs raise, in passing, a claim that SEB failed to pay guards for travel expenses.  Plaintiffs request that the Court authorize notice to all guards nationwide for these claims.

In response to plaintiffs' travel time claims, defendants argue that:  (1) fact-intensive individualized inquiries will be necessary to determine, for each instance of travel time, the amount of time the guard spent traveling as well as the compensability of that time; and

6

(2) conditional certification is not appropriate for undercover guards because they rarely, if ever, travel between worksites.  Defendants also argue that plaintiffs' allegations of "shorting" and payment of overtime at improper rates are too sporadic and anecdotal to suggest unlawful policies or practices.

Some of defendants' arguments rely on the competing declarations from current employees that defendants have submitted ("defendants' declarations").  Before turning to the specific practices plaintiffs allege, the Court will address the preliminary question of what, if any, weight the Court should give to the defendants' declarations.

**C.      The Court Will Not Consider Defendants' Declarations**

Defendants have offered declarations from current employees and other evidence in an effort to undermine plaintiffs' proof.  However, courts in this Circuit regularly refuse to rely on such declarations when plaintiffs have not yet had an opportunity to depose the declarants.  See Amador, 2013 WL 494020, at *8 (S.D.N.Y. Feb. 7, 2013) (collecting cases); Stevens v. HMSHost Corp., No. 10–CV–3571, 2012 WL 4801784, at *3 (E.D.N.Y. Oct. 10, 2012) (reasoning that consideration of such declarations would require a court to weigh evidence and determine credibility).  But cf. Laroque v. Domino's Pizza, LLC, 557 F. Supp. 2d 346, 355–56 (E.D.N.Y. 2008) (relying on evidence submitted by defendants in limiting scope of conditional certification).

Here, the Court will not rely on defendants' declarations, which seek to rebut plaintiffs' allegations.  Rather, the Court will focus on plaintiffs' declarations and the deposition testimony of the named plaintiffs.  Of course, to the extent that any evidence defendants submit actually helps plaintiffs' case, the Court will consider it.

**D.**   **Travel Time Claims**

1. Overview

Plaintiffs argue that time they spend traveling between worksites is compensable.  The general rule is that time spent traveling from job site to job site during a workday is compensable under the FLSA.  29 CFR § 785.38.  By contrast, commuting from home to work is ordinarily not compensable.  29 CFR §§ 785.35, 785.36.

SEB does not pay undercover or uniformed guards for the time they spend traveling from one worksite to another.  Newton Dep. 173:9–21; 175:2–176:3; 176:18–177:4; see also, e.g., Dep. of Amadou Barry ("Barry Dep.") 98:7–100:6, Reply Decl. of Suzanne B. Leeds in Further Supp. Conditional Certif. Mot. ("Leeds Reply Decl.") Ex. K.

Although guards would sign in and out on time sheets at each worksite, see, e.g. Barry Decl. ¶ 7, SEB did not have the guards record the time they spent traveling between worksites.

2. Undercover Guards' Travel Time

To minimize the likelihood of being recognized, undercover guards work at different locations each day, and also work short shifts, of five or fewer hours, at each location.  Newton Decl. ¶ 6.  Because their shifts at each location are short, many undercover guards work two shifts, at different locations, in a single day.  See, e.g., Dep. of Engin Malcok ("Malcok Dep.") 34:4–22, Leeds Reply Decl. Ex. L;[3] Newton Decl. ¶ 6; Newton Dep. 169:3–12; 176:4–14.  This results in undercover guards regularly having to travel between locations during their workday.  See  Malcok Dep. 34:4–22.

---

[3]   Although Malcok's claims are time-barred and he has been dismissed from this action, evidence concerning Malcok is still relevant.  See Rosario v. Valentine Ave. Disc. Store, Co., Inc., 828 F. Supp. 2d 508, 516 (E.D.N.Y. 2011).

A number of factors affect the amount of time undercover guards spend traveling each day between job sites. Because undercover guards work in different locations each day, their daily travel time between work locations varies. Moreover, guards use different modes of transportation to travel between worksites. Some guards use public transportation and taxis while others drive between job sites. See, e.g., Barry Dep. 56; Decl. of Samuel Bowser ("Bowser Decl.") ¶ 9, ECF No. 39; Decl. of Murphy Moise ¶ 9, ECF No. 39.

    3. Uniformed Guards' Travel Time

In contrast to undercover guards, uniformed guards, who do not need to avoid detection, work longer shifts and are usually posted at the same location each day. Newton Decl. ¶ 7. However, on infrequent occasions, uniformed guards will work at two different locations on the same day. See Dep. of Gungor Akcelik ("Akcelik Dep.") 34:19–22; 38:2–16, 47:6–9, Dec. of Anastasia Kerdock Supp. Defs.' Suppl. Reply Mem., ECF No. 64. This can sometimes result in travel time.

The record concerning the work schedules and travel time of uniformed guards is sparse. The only detailed evidence on this issue is Akcelik's deposition testimony. Id. passim;. Plaintiffs' other evidence regarding uniformed guards' travel is too vague to have much probative value.[4]

Akcelik's testimony reveals two circumstances that could cause uniformed guards to work in two different locations on the same day and travel between job sites. First, on some

---

[4] Although Akcelik's declaration asserts that he traveled between assignments and complained about not being paid for travel time on a few occasions, it does not provide any details about the frequency of, or reasons for, this travel. Decl. of Gungor Akcelik Decl. ¶¶ 8–9, ECF No. 44. The other evidence plaintiffs cite is also unhelpful. One opt-in, Hamit Pehlivan, worked as both an undercover and uniformed guard; however, his declaration's statements regarding travel do not distinguish between these two positions, and he never explicitly states that he engaged in any travel as a uniformed guard. Decl. of Hamit Pehlivan ¶¶ 3, 8–10, 11, ECF No. 44. Finally, Malcok, an undercover guard, testified that several uniformed guards, whose names he could not recall, told him that they sometimes had to "travel." Malcok Dep. 19–21. Malcok's testimony, however, does not elaborate on what this "travel" entailed.

occasions, Akcelik would arrive at a client site and work for an hour, only to have the SEB dispatcher inform him that there had been a mistake and that Akcelik needed to report to a different location that was 10 or 15 miles away.  Akcelik Dep. 52:5–53:8; 54:12–16.  It appears that SEB would not pay Akcelik for this travel time.

Second, SEB might need a guard to cover another guard's shift.  Akcelik Dep. 37:7–14.  This could, but would not necessarily, result in travel time.   All of the specific incidents involving shift coverage in Akcelik's deposition follow the same pattern:  Akcelik, who worked the night shift, would finish his shift at 6 a.m. on Saturday morning and return home for his day off when he would receive a call from SEB directing him to work at a different location sometime later that day.  Akcelik Dep. 98:12–104:7.  None of these instances involved Akcelik traveling from one worksite to another; instead, he traveled from his home to the second assignment.   However, another uniformed guard, whose declaration defendants provided, admitted that he would travel between work sites when he needed to cover for another guard.[5]  Decl. of Jose Salgado ("Salgado Decl.") ¶¶ 2–3 (would work two shifts at different stores and travel between work sites "two or three times a year"), ECF No. 41.

4.  Analysis of Travel Time Claims

Defendants' primary argument against both the undercover and uniformed guard classes is that fact-intensive individualized inquiries will be necessary to determine various issues, including the amount of time each guard spent on any given day traveling between work sites.  However, determining the amount of each guard's travel time is essentially a question of

---

[5]  Defendants have also submitted the declarations of two other uniformed guards.  Although these guards also occasionally covered shifts for fellow guards, they maintain that they never traveled to a different location for those shifts.  Decl. of Richard Osborne ¶ 2 (supervisor at movie theatre with multiple guards who only covered shifts for other guards at the same movie theatre), ECF No. 41; Decl. of Eddie Ware ¶ 4 (uniformed guard who only covered shifts for fellow guards at his own work location), ECF No. 41.

damages and does not justify denying conditional certification here. Additionally, defendants' argument that conditional certification of the uniformed guards' claims is inappropriate because they rarely, if ever, traveled between worksites, does not persuade the Court. Thus, the Court grants conditional certification for the travel time claims of all undercover and uniformed guards.

Although defendants often argue that the necessity of fact-intensive individualized inquiries will render a collective action unmanageable, the majority of courts in this Circuit decline to consider such arguments at the conditional certification stage, and, instead, put these issues off until the decertification stage, when discovery is complete. See, e.g., Salomon v. Adderley Indus., Inc., 847 F. Supp. 2d 561, 565 (S.D.N.Y. 2012); Cunningham v. Elec. Data Sys. Corp., 754 F. Supp. 2d 638, 647–48 (S.D.N.Y. 2010); Francis v. A&E Stores, Inc., No. 06–CV–1638, 2008 WL 4619858, at *3 n.3 (S.D.N.Y. Oct. 16, 2008); see also Amador, 2013 WL 494020 (S.D.N.Y. Feb. 7, 2013) (conditionally certifying nationwide off-the-clock suit).

Moreover, courts have conditionally certified classes in large off-the-clock cases despite the individualized issues such cases present. See, e.g., Amador, 2013 WL 494020 (nationwide class); see also Maynor v. Dow Chem. Co., No. G–07–0504, 2008 WL 2220394, at *9–10 (S.D. Tex. May 28, 2008) (granting conditional certification in off-the-clock suit, and noting that "[t]he extent to which individualized inquiries will undermine the efficiencies of collective treatment depends heavily on the number of employees who opt in"). Even where individualized testimony into damages is required, a court may ultimately conclude, at the decertification stage, that bifurcating an action into liability and damages phases will render it manageable. See Maynor, 2008 WL 2220394, at *9–10 (S.D. Tex. May 28, 2008); Maynor v. Dow Chem. Co., 671 F. Supp. 2d 902, 931–37 (S.D. Tex. 2009) (denying decertification motion where individualized damages proceedings were required for 130 opt-ins); cf. In re Visa

11

Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001) (discussing, in antitrust class action, various management tools, including bifurcation, that courts can use to address individualized damages issues).

In contrast to these cases, SEB points to some decisions denying conditional certification in large off-the-clock suits because numerous individualized inquiries would be necessary to resolve liability and damages.  See, e.g., England v. New Century Fin. Corp., 370 F. Supp. 2d 504, 511 (M.D. La. 2005).  In many of these decisions, however, the court also concluded that the plaintiffs failed to show an unlawful company-wide policy.  See id.; Diaz v. Electronics. Boutique of Am., No. 04–CV–0840, 2005 WL 2654270, at *3–5 (W.D.N.Y Oct. 17, 2005); Smith v. Micron Electronics, Inc., No. CV-01-244, 2005 WL 5336571, at *4 (D. Idaho Feb. 4, 2005) (granting decertification).  By contrast, here, SEB has a policy of not paying for travel time.

Although each guard may have to testify about how often he engaged in travel time and how much time he spent traveling, the Court finds this is not a bar to conditional certification.

SEB also contends that individualized inquiries will be required to resolve: (1) the compensability of the guards' "down-time"; (2) SEB's de minimis defense; and (3) the question of whether SEB had actual or constructive knowledge of the guards' compensable travel time. However, many of the issues related to these defenses could potentially be resolved on a class-wide basis.  Any individualized issues that remain can likely be addressed in subsequent damages proceedings.  For example, in determining whether work time is de minimis and, thus, not compensable, courts look to:  "(1) the practical administrative difficulty of recording additional time; (2) the size of the claim in the aggregate; and (3) whether the claimants performed the work on a regular basis."  Singh v. City of New York, 524 F.3d 361, 371 (2d Cir.

2008).  The current record suggests that SEB's de minimis defense could potentially be resolved on a class-wide basis for each type of guard.  Further, although SEB contends that certain specific instances of very brief travel time might be excludable, even if the Court were to find that travel time below a certain threshold is not compensable, such a determination can likely be factored into subsequent damages proceedings in a manageable fashion.

Conditional certification is clearly appropriate for the undercover guards' travel time claims given that the number of undercover guards is relatively small.  Defendants' other arguments against certification of the undercover guard's travel time claims are meritless.[6]

Although there are many more uniformed guards, the Court finds that their travel time claims are also suitable for conditional certification.[7]

In addition to defendants' general objections to collective treatment of this type of off-the-clock suit, defendants also argue that because uniformed guards rarely, if ever, travel between worksites, plaintiffs have failed to show that SEB had a company-wide policy to regularly require uniformed guards to travel between work locations without compensation.  Plaintiffs respond that "unpaid travel time was a common occurrence for uniformed [guards]."  Pls.' Suppl. Reply Mem. Supp. Mot. Conditional Certif. at 4, ECF No. 68.

Although travel between worksites was not a common occurrence for uniformed guards, the practice of uniformed guards sporadically covering the shifts of fellow guards appears

---

[6]  SEB argues that that the undercover opt-ins, who all worked in the New York metropolitan area under one supervisor, are not similarly situated to any other undercover guards because the opt-ins' supervisor required them to travel much longer distances.  This distinction is not a basis to deny conditional certification because it goes to damages.  Furthermore, the Court notes that even defendants' declarants admit that they often engaged in not insignificant amounts of travel time.  See, e.g. Decl. of Brian Vogelfang ¶ 6 (generally spent 20 to 30 minutes traveling).

[7]  Some uniformed guards may have never traveled and even the guards who did, likely only traveled on a few occasions; those facts suggest that the uniformed guards' travel time claims may be manageable.  Cf. Maynor, 2008 WL 2220394, at *9 ("The extent to which individualized inquiries will undermine the efficiencies of collective treatment depends heavily on the number of employees who opt in.").

widespread and seems likely to lead to some travel time claims for a substantial number of uniformed guards.  This practice, along with SEB's policy of not paying for travel time, warrants conditional certification of the uniformed guards' travel time claims.[8]

Finally, plaintiffs seek nationwide notice for both the undercover and uniformed guards.  SEB raises various arguments to limit the scope of the class, none of which are persuasive.  Although the opt-ins' only worked in the tri-state area, that is not a compelling reason to limit notice to guards in that geographic region.  SEB has a company-wide policy of not paying for travel time and one would expect that the experiences of undercover and uniformed guards in other regions concerning travel time will generally mirror the experiences of the opt-ins.  Accordingly, the Court authorizes nationwide notice to all undercover and uniformed guards.

### E.     SEB's Alleged Practice of Not Paying Overtime Wages for All Hours Worked

Plaintiffs allege that SEB has a general policy of not paying overtime wages due for all hours worked.  As evidence of this alleged catch-all policy, plaintiffs cite:  (1) incidents where plaintiffs' hours were "shorted"; and (2) SEB's alleged payment of overtime at straight-time wages.  As explained below, the Court grants conditional certification for these claims as to all uniformed and undercover guards.

#### 1.  "Shorting" of Hours

Plaintiffs' evidence regarding "shorting" of hours is suggestive of a company-wide practice.

---

[8]  In advocating for conditional certification, plaintiffs do not explicitly rely on SEB's practice of having uniformed guards cover the shifts of fellow guards.  Instead, plaintiffs point out that Akeclik would sometimes have to engage in travel time because his dispatcher would initially assign him to the wrong job site and would later re-direct him to a different location.  Id. at 4 n.4 (citing testimony on this issue as well as the unspecific declarations of Ackeclik and Pehlivan); see also Pls. Reply Mem. Supp. Mot. Conditional Cert. at 3, ECF No. 44.  The record, however, does not indicate that other uniformed guards, particularly those under other supervisors and dispatchers, were subjected to this practice.  If this were the only evidence of uniformed guards traveling between worksites, conditional certification of a nationwide class of uniformed guards would likely not be appropriate.

Each opt-in's declaration asserts that he was "consistently" or "typically" "shorted" hours, with the declarants' estimates generally ranging from one to four "shorted" hours each week. See, e.g., Barry Dec. ¶ 15; Decl. of Ragip Erdem ("Erdem Decl.") ¶ 15, ECF No. 39. Three of the declarants assert that they complained to supervisors or the payroll department, but would "sometimes" (or, for some opt-ins, would "more often than not") fail to receive all of their missing hours. See Barry Decl. ¶ 15; Erdem Decl. ¶¶ 15–16; Bowser Decl. ¶ 16.

The deposition testimony of Malcok, Barry, and Akcelik provides greater detail about plaintiffs' "shorting" claim. On a few occasions, Barry and Malcok were not paid for all of the time that they recorded on their time sheets. Barry Dep. 74:18–75:13, 76:16–77:15; Malcok Dep. 74:6. This would occur for various reasons: (1) another guard would fail to fax a store's weekly time sheet to SEB at the end of the week[9]; (2) SEB could not understand the writing on a time sheet and would have to speak with the guard and the store manager at the client location; or (3) SEB would miscalculate hours. Barry Dep. 75:8–13, 78:6–14; Malcok Dep. 72:13–75:14 Barry and Malcok would complain about missing hours to their supervisor or the payroll department. Barry Dep. 75:17–76:5; 77:16–18; Malcok Dep. 72:13–75:14. They were paid for some, but not all of the missing hours. Malcok Dep. 75:19–76:8; Barry Dep. 75:23–25, 77:19–25, 77:19–25, 114:3. On a few occasions, SEB gave Barry the "runaround" about miscalculated hours and he would cease pursuing his complaint. Id. at 77:19–25; cf. Malcok Dep. 77:6–16.

Although Akcelik was initially not paid for all of his hours on two or three occasions one month, he was eventually paid for this time after he complained to the nephew of SEB's owner. Akcelik Dep. 44:13–45:2. Akcelik only recalled one other incident where he was not paid correctly. On one occasion, he never received $120 despite complaining to his supervisor, who

---

[9] A time sheet might contain time entries for multiple guards that worked at the client location that week.

indicated that he would let the accounting department know about the problem.  <u>Id.</u> at 125:8–128:5.

Akcelik also testified about the experience of another uniformed guard, named Zeynep, who was shorted hours.  <u>Id.</u> at 108:25–110:6.  Zeynep told Akcelik that she was shorted eight hours one week and did not receive the time despite repeated complaints to supervisors.[10]  <u>Id.</u> at 109:23–110:6.  A number of other employees also complained to Akcelik that their checks were "deficient" and did not include all of the hours they worked.  <u>Id.</u> at 64:5–65:16 (indicating that Akeclik called SEB many times on behalf of other guards), 112:8–114:24, 14312–19.  Akcelik, however, did not know whether these employees ever complained to SEB or whether they were ever paid for the missing amounts.  <u>Id.</u> at 113:16–115:24.

In addition to the incidents of "shorting" discussed above, plaintiffs also note that SEB has a general policy of trying to reduce overtime because SEB is unable to bill overtime to its clients, and, thus, loses money on every hour of overtime.  Newton Dep. 66, 166–67.  Although this policy is facially lawful, it has some general relevance to plaintiffs' claims.

Plaintiffs essentially ask the Court to infer, from all of the evidence above, that SEB had, as part of a general policy to deny overtime, a company-wide practice of "shorting" guards' hours.  SEB counters that plaintiffs' claims of shorting are too sporadic and anecdotal to suggest a common unlawful policy.

This is a close question.  Ultimately, the Court finds plaintiffs' evidence sufficient to suggest an unlawful practice.  Notably, each deposed plaintiff testified to instances where guards were not properly paid despite complaining to supervisors or the payroll department.  <u>See</u> <u>also</u>

---

[10]  "[C]ourts in this Circuit regularly rely on hearsay evidence to determine the propriety of sending a collective action notice."  <u>Winfield v. Citibank, N.A.</u>, 843 F. Supp. 2d. 397, 402–03 (S.D.N.Y. 2012) (citation and internal marks omitted).

Erdem Decl. ¶¶ 15–16 ("more often than not" would not receive all missing hours after complaining); Bowser Decl. ¶ 16 (same).

Conditional certification for all undercover and uniformed guards is warranted on this claim.  Payroll is centralized, and some of the plaintiffs' complaints to payroll were not addressed, suggesting that, if an unlawful policy exists, it was not limited to certain supervisors.

2.  Overtime Allegedly Paid at Improper Rates

Conditional certification is also warranted as to plaintiffs' claims regarding payment of overtime at improper rates.

Plaintiffs' declarations assert that, for all overtime hours they worked, they were paid at their straight-time rate.  See Barry Decl. ¶¶ 13–14; Decl. of Cemal Pehlivan ¶¶ 11–12, ECF No. 39.

In response, SEB points out that, on at least some occasions, plaintiffs were indisputably paid one-and-a-half-times their straight-time rate.  See, e.g, Barry Dep. 89:20–23; Sample of Earnings Statements, Decl. of Anastasia Kerdock Supp. Defs.' Opp. to Mot. Conditional Certif. Exs. 11–18, ECF No. 41.  In light of this, SEB contends that other instances where allegedly improper rates were used are too sporadic and individualized to warrant collective treatment. However, that employees may have been paid properly on some occasions does not convince the Court that a collective action is inappropriate here.  Even Barry's testimony, which defendants cite, indicates that he was paid an improper rate "most of the time" that he worked overtime. Barry Dep. 89:20–23.

In a footnote, SEB raises an affirmative exemption defense that, in certain situations, allows employers to use hourly rates for different work.  29 U.S.C. § 207(g)(2).  SEB contends that it paid different hourly rates for different clients pursuant to § 207(g)(2) and suggests that,

even if this defense might be inapplicable for certain guards and certain weeks, such claims are too sporadic and individualized to resolve on a collective basis.  Plaintiffs do not address this defense.

Where an exemption defense is central to a case, plaintiffs may be required to make "some showing" that they are similarly situated with respect to that exemption.  See Myers, 624 F.3d at 555 (discussing duties-based managerial and administrative exemptions).  However, SEB's decision to raise this defense in a footnote is insufficient to trigger plaintiffs' obligation, under Myers, to establish that they are similarly situated with respect to this defense.

At this stage, plaintiffs' assertions that they were paid at improper rates suggests that the guards are similarly situated with respect to this practice and to plaintiffs' allegation of a general policy to deny overtime.  Accordingly, the Court conditionally certifies plaintiffs' claims based on hours shorting and payment of overtime at improper rates.[11]

**F.  Travel Expenses**

In their declarations, plaintiffs allege that they were not reimbursed for their travel expenses in commuting to work or traveling between worksites.  Defendants respond that travel expenses are not compensable under the FLSA.  Plaintiffs do not respond to defendants' argument and do not articulate how their travel expense allegations could possibly give rise to

---

[11]   In conditionally certifying these claims, the Court is, of course, cognizant of its earlier decision to authorize nationwide classes for the travel time classes.  Although certification of the travel time claims does not automatically justify certification of plaintiffs' other claims, plaintiffs' other claims present close questions and the fact that notice is already being sent to nationwide classes would seem to weigh in favor of also certifying plaintiffs' other claims.  Cf. Berndt v. Cleary Building Corp., No. 11-cv-791, 2013 WL 3287599, at *12 (W.D. Wisc. Jan. 25, 2013) (noting that court's decision to conditionally certify claims regarding pre- and post-shift work was "influenced in part" by court's certification of claims concerning mandatory morning meetings and the fact that the former claims would not burden defendant with much extra discovery).  The Court, however, notes that it has a number of reservations about plaintiffs' other claims, including:  (1) whether plaintiffs' allegations regarding shorting and improper rates are sufficiently similar to suggest any general policy to deny overtime; and (2) whether either of these allegations will ultimately be amenable to resolution on a collective basis.

claims under the FLSA.  However, because the Court is already authorizing notice to all guards on plaintiffs' other claims and plaintiffs' proposed notice does not even mention the travel expenses claim, the Court sees no reason to address the travel expenses claim here.  See Proposed Notice, Decl. of Suzanne Leeds Supp. Mot. Conditional Certif. Ex. H, ECF No. 39.

## G.  Notice Period

The FLSA has a three-year statute of limitations, which runs from the date an opt-in files a consent.  29 U.S.C. § 256(b).  Plaintiffs, however, request that notice be sent to all guards who worked at SEB since October 19, 2005–a six-year period running from the filing of the complaint.  Defendants suggest a three-year notice period.  See Defs.' Mem. Opp'n Pls.' Mot. Conditional Certif. at 24, 24 n.9, ECF No. 42.  The Court concludes that a three-year notice period, running from May 7, 2012, is appropriate.

Some decisions in this Circuit have authorized notice going back six years because parallel NYLL claims have a six-year statute of limitations.  Courts, however, are divided over this issue.  Compare, e.g., Winfield, 843 F. Supp. 2d at 410 (authorizing six-year notice period because opt-ins who "have potential claims under New York law, but not under the FLSA, may be relevant to a subsequent determination as to whether a class should be certified under New York law."); Realite v. Ark Rests. Corp., 7 F. Supp. 2d 303, 308 n. 4 (S.D.N.Y. 1998), with Hamadou v. Hess Corp., 915 F. Supp. 2d 651, 668 (S.D.N.Y. 2013) (granting three-year notice period because plaintiffs had not yet moved for certification of the NYLL claims and "[i]t would be confusing to employees who are ineligible for the FLSA opt-in class to receive the opt-in notice, which does not relate to any state law claims.").

The Court agrees with the decision in <u>Hamadou</u> that a six-year notice period is not appropriate.[12]

Where a court refuses to authorize a six-year notice period, "[n]otice would normally be provided to those employed within three years of the date of the notice." <u>Hamadou</u>, 915 F. Supp. 2d at 669.  Here, however, notice to all guards employed since May 7, 2009—three years prior to plaintiffs' service of the motion for conditional certification—is appropriate.

Although the FLSA's statute of limitations ordinarily runs from the date an opt-in files a consent form, where plaintiffs have diligently pursued their claims, some courts have equitably tolled the statute of limitations while a motion for conditional certification is pending before the court.  <u>See</u> <u>McGlone v. Contract Callers, Inc.</u>, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012); <u>Colon v. Major Perry St. Corp.</u>, No. 13–CV–3788, 2013 WL 3328223, at *8 (S.D.N.Y. July 2, 2013).  Because plaintiffs have not requested equitable tolling and a decision equitably tolling the statute of limitations would have to be issued as a report and recommendation to Judge Townes, I will not determine whether the statute of limitations should, in fact, be equitably tolled.  It is, however, well within my discretion to key the three-year notice period to the service of plaintiffs' motion, rather than to the grant of conditional certification.  This approach will allow potential opt-ins to preserve claims that equitable tolling may cover, and the Court can make a definitive ruling on the propriety of equitable tolling down the road.

**E.  Contents of Notice**

The Court directs the parties to confer regarding the contents of the notice.  The Court will, however, resolve two issues that SEB raises regarding plaintiffs' proposed notice.  First, the

---

[12]  Moreover, a six-year notice period would make little sense for the nationwide class in this case given that many guards work outside of New York.

notice shall state:  "If you choose to join this case, you may be required to participate in written discovery, submit to a deposition, and/or testify at trial."  Second, the 60-day opt-in window that plaintiffs propose is appropriate.  The parties shall submit a revised notice by December 11, 2013.  If the parties have any remaining disputes over the notice, they should contact the Court to schedule a telephone conference.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for conditional certification is granted.  By December 11, 2013, the parties shall provide a revised proposed notice form to the Court and plaintiffs shall file their amended complaint.

Dated: November 22, 2013
      Brooklyn, New York

                                        **/s/**
                                JOAN M. AZRACK
                                UNITED STATES MAGISTRATE JUDGE